UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWNA LEE WESNESKI, | : |
| | :CIVIL ACTION NO. 3:16-CV-1903 |
| Plaintiff, | : |
| | :(JUDGE CONABOY) |
| v. | : |
| | : |
| NANCY A. BERRYHILL,[1] | : |
| Acting Commissioner of | : |
| Social Security, | : |
| | : |
| Defendant. | : |
| | : |

_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Doc. 1.) Plaintiff filed an application for benefits on February 14, 2013, alleging a disability onset date of February 13, 2013. (R. 1.) After Plaintiff appealed the initial denial of the claim, a hearing was held on July 22, 2014, and Administrative Law Judge ("ALJ") Patrick Cutter issued his Decision on August 6, 2014, concluding that Plaintiff had not been under a disability at any time from February

_____

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure which addresses the substitution of parties when a public officer is replaced, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. Fed. R. Civ. P. 25(d). No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), which states that "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office."

13, 2013, to the date last insured of March 31, 2014.  (R. 39-49.) Plaintiff requested review of the ALJ's decision which the Appeals Council granted on March 16, 2016.  (R. 4.)   In the Decision of the Appeals Council dated July 22, 2016, Plaintiff's date last insured was extended to December 31, 2014, and the ALJ's Decision was otherwise adopted, the Appeals Council concluding that newly submitted evidence either did not warrant a change in ALJ Cutter's determinations or did not relate to the relevant time period.  (R. 4-8.)

Plaintiff filed this action on September 16, 2016 (Doc. 1), asserting in her supporting brief that the Acting Commissioner's determination should be reversed for the following reasons: 1) the ALJ erred when he found that Plaintiff's impairments or combination of impairments did not meet or equal one of the listed mental health impairments (Doc. 11 at 3-12); and 2) based on inadequate consideration of symptoms related to Plaintiff's mental health impairments, the ALJ failed to find Plaintiff disabled under the Medical-Vocational Rules after improperly determining she was capable of performing light work (*id.* at 12-14).  After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

### I. Background

Plaintiff was born on July 16, 1964, and has at least a high school education.  (R. 47-48.)  The ALJ determined that Plaintiff

2

had past relevant work as an administrative clerk, income tax return preparer, and account executive.  (R. 47.)  In a February 20, 2013, Disability Report, Plaintiff reported that the following physical and mental conditions limited her ability to work: diabetes; depression; memory lapse/loss; anxiety disorder due to general medical condition; hypertension; asthma with acute exacerbation; obesity; panic disorder without agoraphobia; obstructive sleep apnea; and hyperlipidemia.  (R. 177.)  Plaintiff said she stopped working on February 13, 2013, because she was fired.  (R. 177-78.)  She further indicated that, although she was fired for other reasons, she believed her conditions became severe enough to keep her from working as of January 15, 2013.  (R. 178.)

**1.**  **Medical Evidence**

Because Plaintiff's claimed errors relate to her mental health conditions, the Court will focus on medical evidence related to those conditions.  Although February 13, 2013--the date Plaintiff stopped working--is the alleged disability onset date, records from the preceding six months are reviewed for context.

Plaintiff was seen for a check up at Hanover Family Medicine by Vernon Preston, M.D., on July 24, 2012.  (R. 311.)  She presented as tearful and stated she had a panic attack all day.  (*Id.*)  She said she had been without insurance for a while but had acquired insurance and wanted to have testing done.  (*Id.*)  Plaintiff reported that she was having memory loss and was feeling

depressed.  (*Id.*)  Dr. Preston noted she was willing to see someone for counseling.  (*Id.*)

In August 2012, Dr. Preston's notes show that memory and depression were still issues and Plaintiff did not feel her depression was controlled.  (R. 306.)  At Plaintiff's September 18, 2012, visit, Plaintiff felt her depression was controlled but her anxiety was not.  (R. 302-03.)  She reported a potential medication side effect was that she was waking up a lot at night and having very vivid dreams.  (R. 302.)  Plaintiff said she was concerned about an increase in memory loss and anxiety, and she was experiencing low blood sugars in the middle of the night which increased her anxiety.  (R. 303.)

At her visit to Wellspan Endocrinology on October 12, 2012, Ashok Kuruvilla, M.D., noted that Plaintiff was unable to manage her insulin pump at the time because of her memory loss.  (R. 288.)  In addition to history directly related to diabetes, Dr. Kuruvilla noted that Plaintiff reported panic attacks, anxiety, depression, sleeping too much, trouble falling asleep, and trouble staying asleep.  (R. 290-91.)  On physical exam, he noted that Plaintiff looked anxious and mildly depressed.  (R. 291.)

On October 22, 2012, Plaintiff had a neurology consultation with Xi Lin, M.D., at Wellspan Rheumatology.  (R. 332.)  Dr. Lin noted that Plaintiff said over the preceding five years she had worsening attention and concentration, and she was easily

4

distracted or overwhelmed.  (R. 333.)  He further noted that Plaintiff reported she could function at home with no significant difficulties.  (*Id.*)  On physical exam, Dr. Lin found Plaintiff alert and oriented to person, place and time, with normal affect and expression, no aphasia, and good insight with a good fund of knowledge.  (R. 335.)  Because of her reported progressive memory loss, poor concentration, and fatigue, he scheduled MRI of the brain, EEG, and sleep study.  (R. 332.)  His differential diagnosis included obstructive sleep apnea, epilepsy, and cerebrovascular accidents.  (*Id.*)

On November 30, 2012, Dr. Kuruvilla noted that Plaintiff had not followed directives regarding faxing her blood glucose chart weekly, she had not yet seen the dietician and she had been very erratic and infrequent with blood glucose monitoring.  (R. 279.) He added that she had symptoms when she had low blood glucose levels.  (*Id.*)

On February 11, 2013, Plaintiff saw Dr. Preston with the chief complaint of severe anxiety attacks.  (R. 295.)  Dr. Preston recorded a detailed history.

> Patient states her anxiety level has greatly increased recently with her job.  She states her job is the job from hell.  She does not want to quit but she does need to get her anxiety under control.  Her job is very hectic and she has had to take some mental health days to relieve her stress level.  She needs a return to work note.  She states she was hired to help elderly patients pay for their heat during the winter time.

It has not been as busy as last year.  As a
result, she is now answering telephones for
the department of public welfare.  She states
[there are] times that she hides underneath
her desk and places a blanket over the back
[of] the desk so that no one can see her and
she takes her headphone off for decompression
time.  She states she has panic attacks on a
daily basis now.  On reviewing, she has not
been taking citalopram on a regular basis.
She has been using lorazepam for her panic
attacks and often uses one to two per day.

(R. 295.)  Dr. Preston decided to switch Plaintiff from the pump to

subcutaneous insulin because of her poor memory and lack of

monitoring and he continued her on lorazepam for anxiety.  (R. 295-

96.)

On March 14, 2013, Plaintiff reported to Dr. Preston that she

had lost her job and was trying for disability.  (R. 377.)  She

said she could not keep a job because of her depression and

anxiety--she was fighting coworkers and having panic attacks at

work.  (*Id.*)  Plaintiff said she wanted to increase her anxiety

medication and she felt her depression was controlled.  (*Id.*)

Anthony J. Fischetto, Ed.D., performed a clinical

psychological examination and review of documents on April 9, 2013.

(R. 315.)  He reported that Plaintiff was crying throughout the

evaluation.  (*Id.*)  Regarding the history of her illness, Dr.

Fischetto recorded that Plaintiff said "she has diabetes and this

has caused her stress and caused her to have panic attacks which is

hard to distinguish between low blood sugar.  She has depression."

(R. 316.)  At the time, Plaintiff was taking lorazepam and Zoloft

6

prescribed by her family doctor.  (*Id.*)  She said she had never
seen a psychiatrist and was not getting any therapy for her panic
attacks or sleep problems.   She told Dr. Fischetto that
psychiatrists scared her "because her mother and sister were taken
away in straight jackets by medical personnel."  (R. 316.)
Plaintiff said she could not work because of the panic attacks and
asthma as well as arguing and crying.  (R. 318.)  Mental Status
Examination included the following findings:  Plaintiff was crying
and restless; her speech consisted of crying and she was able to
understand clearly; she was depressed, anxious, and angry, and she
fought with her in-laws and people at work; she had panic attacks
lasting fifteen seconds to fifteen minutes once or twice a day with
fast heart beat, sweating, shaking, trembling, and shortness of
breath; she was having a panic attack at the time; she had sleep
problems including falling asleep, early morning wakening, and
nightmares of getting lost; productivity of thought was
spontaneous; continuity of thought was goal-directed and no
looseness of association; content of thought consisted of fear of
going to work and getting into a fight; she had no delusions; her
abstract thinking was good for similarities; she had average fund
of information; regarding concentration, she was slow for serial
sevens; she was oriented to time, place and person; her remote
memory was limited in that she did not remember much of her
childhood, her recent past memory was average, and her immediate

retention and recall was poor for Digit Span; her test judgment was good; her insight was limited; and her reliability was average. (R. 318-20.)  Diagnoses included major depressive disorder, recurrent, moderate; personality disorder, NOS; reported problems with diabetes, overweight, asthma, hyperlipidemia, OSA, and hypertension; stress with her physical condition, not working, arguments with people; and a GAF score of 50.  (R. 320.)  Dr. Fischetto's prognosis was "[g]uarded and chronic." (*Id.*)  He added that Plaintiff needed ongoing psychiatric and psychological help. (*Id.*)

In April 2013, Dr. Preston stated that the following month he would consider changing anxiety medication because Plaintiff wanted to be on a non-controlled substance medication.  (R. 373.)  He hoped that her stress would be decreased, noting that a decision would be made on her wrongful firing suit.  (*Id.*)  He commented that Plaintiff had not yet seen Dr. Carlson, she continued to have issues with depression and confusion as well as life stressors at home, she was apprehensive about seeing a psychologist, and she was in the middle of a lawsuit that was causing her a lot of stress. (R. 373-74.)  Plaintiff reported that she felt her depression was controlled and she was tolerating the depression medication without side effects.  (R. 375.)

On July 22, 2013, Dr. Preston again noted that Plaintiff was having panic attacks and wanted the change medications so she would

not have to come into the office for medication pickup.  (R. 370.)
He added that Plaintiff had not been taking the citalopram on a
regular basis.  (*Id.*)  Plaintiff did not feel that her panic
attacks were controlled, and Dr. Preston noted that she was not
compliant with medications/treatment recommendations.  (R. 370.)
On examination, he found that psychologically Plaintiff was
oriented and appropriate.  (R. 372.)

At her October 2013 three-month follow-up appointment, Dr.
Preston reported that Plaintiff felt her depression and anxiety
were not controlled.  (R. 363.)  He noted that she was compliant
with medications/treatment recommendations, she was tolerating her
medications well, and psychologically Plaintiff was oriented and
appropriate.  (*Id.*)  Dr. Preston recorded a similar assessment in
November at which time Plaintiff reported that she was seeing a
psychologist.  (R. 357-59.)

In March 2014, Dr. Preston noted that Plaintiff said she was
doing well on Strattera, that she was remembering more and focusing
better.  (R. 352.)  She told Dr. Preston her only concern was that
she was worrying a lot.  (*Id.*)  Dr. Preston recorded that Plaintiff
felt her depression was controlled but she was having side effects
from her medication concerning libido and wanted to try something
different.  (*Id.*)  Examination showed that psychologically
Plaintiff was oriented and appropriate.  (R. 355.)

On April 28, 2014, Dr. Preston recorded Plaintiff was "doing

better with her sugars now that attention deficit is better controlled." (R. 346.)  Plaintiff felt that her depression was controlled and she was tolerating related medications without side effects. (R. 347.)  Examination showed Plaintiff's judgment and mentation were normal. (R. 350.)  He made similar findings on May 29, 2014. (R. 343, 345.)

On July 14, 2014, Dr. Preston noted that Plaintiff's ADHD was well-controlled on Strattera but she felt her depression was not controlled. (R. 338, 339.)

## 2.   **Opinion Evidence**

a.   *Consultative Examiner*

In addition to the April 9, 2013, evaluation summarized above, Dr. Fischetto completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on the same date. (R. 322-24.) Regarding ability to carry out instructions affected by the impairment, Dr. Fischetto opined that Plaintiff had moderate difficulties in her ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions, and she had marked difficulties in her ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. (R. 322.)  He identified the support for his assessment to be Plaintiff's panic attacks, crying throughout the evaluation session, and poor focus. (*Id.*)  Dr. Fischetto also

10

indicated that Plaintiff's ability to interact appropriately with supervisors, co-workers and the public, and respond to changes in the routine work setting was affected by her impairments, but after checking the "Yes" box, Dr. Fischetto did not evaluate the specific categories set out in the form.  (R. 323.)

In the evaluation narrative, Dr. Fischetto included an assessment of the effects of Plaintiff's impairments on function. (R. 320-21.)  Regarding activities of daily living, he concluded that Plaintiff was able to do some cooking and cleaning, and she was able to drive and shop but, when shopping, she did not bring a list and bought unneeded items so her husband did not let her shop. (R. 320-21.)  Dr. Fischetto found that Plaintiff's social functioning was limited as evidenced by a disorderly conduct charge and being fired from many jobs because of arguing.  (R. 321.)  He noted that Plaintiff's concentration, persistence, and pace appeared to be slow because she had trouble focusing and concentrating, and she had difficulty remembering her age.  (R. 321.)  Dr. Fischetto added that Plaintiff was having a panic attack during the evaluation and "[o]bviously, during the panic attack, she was going to have greater difficulty focusing, concentrating and completing tasks."  (R. 321.)

b.   *State Agency Consultant*

On April 24, 2013, state agency consultant Roger Fretz, Ph.D., completed a Psychiatric Review Technique ("PRT") and a

11

Mental Residual Functional Capacity Assessment based on his review of the evidence, including Dr. Fischetto's evaluation.  (R. 85-92.) In the PRT, he reviewed the listing criteria for 12.04-Affective Disorders, 12.06-Axiety-Related Disorders, and 12.08-Personality Disorders and concluded Plaintiff did not satisfy the "paragraph B" or paragraph "C" criteria of the listings.  (R. 87-88.)  Regarding the "B" criteria, Dr. Fretz concluded that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated periods of decompensation each of extended duration.  (R. 88.)

Dr. Fretz opined that Plaintiff was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or proximity to others without being distracted by them.  (R. 89-90.)  He also opined that Plaintiff was moderately limited in her abilities to accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracating them or exhibiting behavioral extremes.  (R. 90.)  Dr. Fretz provided the following narrative explanation for his findings:

> The claimant is capable of self-care/hygiene.  She is able to perform ADLs, able to drive, shop.  She has recently been employed.  Treatment is limited to being prescribed psychoactive medication by PCP, no inpatient care.  She was cooperative with the

12

CE examiner, manifesting no evidence of a thought disorder, no evidence, as per narrative, of severe dysfunction in any area. She described a troubled adolescence, not currently manifesting a similar behavior pattern however does admit to having difficulty with others, can be argumentative. She is however able to engage in social settings, attends church services with a friend.  She was somewhat slow for serial 7's, [s]ome difficulty with concentration and attention.  Able to understand and complete simple instructions.  No problems with adaptation.

The M.S.O. statement is that of A. Fischetto, Ed.D.  His statement is consistent with the MER given appropriate weight of opinion.

The claimant's allegations are partially credible.

The claimant would be capable of understanding and performing simple tasks.

(R. 90.)

c.   *Third Party Function Report*

Plaintiff's husband, Carl A. Wesneski, III, completed a Function Report - Adult - Third Party on March 5, 2013.  (R. 196-203.)  He indicated Plaintiff's conditions limited her ability to work because she was unable to concentrate or focus on completing tasks, and she had difficulty getting along with others which caused her to lose jobs.  (R. 196.)  He noted that Plaintiff frequently awakened due to drops in blood sugar and her anxiety attacks often coincided with the hypoglycemic episodes.  (R. 197.) Mr. Wesneski noted that he had to remind his wife to take insulin,

that her anxiety and lack of concentration/focus interfered with her ability to cook and prepare meals, that she could clean, do laundry and iron with difficulty, she did other housework with difficulty, she drove and shopped as needed, she did some sewing and gardening and watched TV, and she talked with a good friend and went to church with her family once a week.  (R. 198-200.)  Mr. Wesneski identified argumentativeness as a problem regarding Plaintiff's relationships with others which resulted in her inability to hold a job.  (R. 201.)

Mr. Wesneski averred that Plaintiff's abilities regarding talking, hearing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others were all affected by her conditions.  (*Id.*)  He explained that hypoglycemic episodes and anxiety affected all of these areas. Mr. Wesneski also indicated that Plaintiff could follow written instructions moderately well ("often with assistance") and had a similar ability to follow spoken instructions.  (*Id.*) He noted that she was taking Apidra at the time and side effects were hypoglycemia if she took too much and anxiety if she did not take enough.  (R. 203.)

3.  **Hearing Testimony**

At the July 25, 2014, Hearing, Plaintiff, who was represented by counsel, testified that she was supposed to go for a sleep study and forgot to, and she does not always give herself insulin

14

appropriately.  (R. 61.)  Regarding symptoms related to depression,
anxiety, and ADHD, Plaintiff stated that the main issue was
memory--she sometimes forgot where she was going while driving and
had to stop or pull over.  (R. 62.)  Depression and anxiety
symptoms included sadness and a feeling that she was going to fall
down.  (*Id.*)  Plaintiff noted that she thought the memory issue was
causing a lot of anxiety.  (*Id.*)  She said anxiety and depression
medications helped and Strattera had initially provided significant
help for her ADHD including the driving issues.  (R. 63.)  When
asked by the ALJ whether she had any counseling or treatment from a
mental health specialist, Plaintiff responded that she had one
session.  (*Id.*)

Plaintiff said she regularly went to church, she did gardening
and she spent time with a good friend.  (R. 65.)  She noted that
her daily activities included cleaning, watching TV, and activities
with her children.  (R. 65-66.)

Plaintiff testified further about memory issues and forgetting
to take her insulin, adding that she had to quit a job at Target
after two or three days because she forgot her insulin.  (R. 70-
71.)  Her attorney questioned her further about the Target job and
Plaintiff explained that she was stocking shelves during the
training process and the job was more difficult than she expected
because she had to use a computer and scan things.  (R. 71.)  She
also testified about the stress she experienced at the Department

15

of Public Welfare where she answered phones, stating that her supervisor told her not to answer so many calls and that everyone was stressed out.  (R. 72.)  Plaintiff said it was "like Jerry Springer in that place."  (*Id.*)

When reviewing work history, Plaintiff noted that her problems seem to have started since she had diabetes.  (R. 76.)

The ALJ asked Vocational Expert ("VE") Michael Kibler to consider a hypothetical person of Plaintiff's vocational profile who has the residual functional capacity ("RFC") to perform a range of light work, and the

> work should be such that it could be
> performed either sitting or standing.
> There's a need to avoid concentrated exposure
> to temperature extremes, high humidity,
> fumes, gases or dust.  The work should
> involve routine, repetitive, one to two-step
> type tasks; only occasional interaction with
> supervisors, co-workers or the public; only
> occasional changes and occasional decision-
> making.  In addition, there should be no
> judgments on complex work decisions involved
> in the work.

(R. 78-79.)  VE Kibler testified that such an individual could not perform Plaintiff's past relevant work but could perform other unskilled jobs that existed in the national economy such as small products assembler, electrical accessories assembler, and conveyor line bakery worker.  (R. 79.)  ALJ Cutter asked if the hypothetical individual could perform the jobs identified if she were to be absent from work twenty percent of the time, and the VE responded that she could not.  (R. 80.)

16

**4.**   **ALJ Decision**

In his August 6, 2014, Decision, ALJ Cutter made the following Findings of Fact and Conclusions of Law:

1.    The claimant last met the insured status requirements of the Social Security Act on March 31, 2014.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of February 13, 2013 through her date last insured of March 31, 2014 (20 CFR 404.1571 et seq.).

3.    Through the date last insured, the claimant had the following severe impairments: depression; anxiety; attention deficit disorder; personality disorder; asthma; and obesity (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except sit and stand alternative at will, avoid concentrated exposure to temperature extremes, humidity, fumes, gases and dust; routine, repetitive one to two step tasks; occasional interaction with supervisors, coworkers, and the public; occasional changes in the workplace setting; occasional decision-making; and no judgements on complex work decisions.

17

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on July 16, 1964 and was 49 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from February 13, 2013, the alleged onset date, through March 31, 2014, the date last insured (20 CFR 404.1520(g)).

(R. 41-49.)  As noted previously, the Appeals Council extended the

date last insured to December 31, 2014, and otherwise adopted the

ALJ's Decision.  (*See* R. 4-6.)  Other relevant portions of the

ALJ's Decision will be referenced in the Discussion section of this

Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

---

[2]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs which existed in significant numbers in the national economy.  (R. 48-49.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However,

even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."); *see also Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (a remand is not required where it would not affect the outcome of the case.). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be reversed for the following reasons: 1) the ALJ erred when he found that Plaintiff's impairments or combination of impairments did not meet or equal one of the listed mental health impairments (Doc. 11 at 3-12); and 2) based on inadequate consideration of symptoms related to Plaintiff's mental health impairments, the ALJ

23

failed to find Plaintiff disabled under the Medical-Vocational Rules after improperly determining she was capable of performing light work (*id.* at 12-14).

## A.    Step Three Determination

Plaintiff first asserts that the ALJ erred when he found that Plaintiff's impairments alone or in combination did not meet or equal a listed impairment. (Doc. 11 at 3.)  Defendant responds that Plaintiff failed to establish that she meets or medically equals all the criteria of the relevant mental listings. (Doc. 14 at 13.)  The Court concludes that Plaintiff has not shown that the alleged error is cause for reversal or remand.

Plaintiff argues that she satisfies the paragraph B criteria for all relevant mental listings. (Doc. 11 at 4-12.)  To satisfy the paragraph B criteria, a claimant's impairments must result in at least two of the following: marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. pt. 404, subpt. P. app. 1, §§ 12.02B, 12.04B, 12.06B.  A marked limitation is one that seriously interferes with a claimant's ability to function independently, appropriately, and effectively on a sustained basis.  20 C.F.R. pt. 404, subpt. P. app. 1, § 12.00(C).

ALJ Cutter agreed with Dr. Fretz that Plaintiff had mild

restrictions in activities of daily living, moderate difficulties
in social functioning, and moderate difficulties in maintaining
concentration, persistence or pace.  (R. 43.)  ALJ Cutter noted
that his agreement was based on the consistency of the opinion with
the longitudinal record, the doctor's specialization, his
familiarity with the regulations, and his explanation showing a
thorough review of the record.  (*Id.*)

Regarding activities of daily living, the ALJ pointed to Dr.
Fretz's findings that Plaintiff was capable of self-care and
hygiene, activities of daily living, driving and shopping, and the
ALJ concluded the assessment was supported by evidence in the file.
(R. 43.)  Plaintiff points to difficulties with activities of daily
living.  (*See*, *e.g.*, Doc. 11 at 6-7.)  However, the record in
general, including her testimony and her husband's statements, does
not support her statement that she "is limited to watching
television daily . . . and is limited to activities that require
minimal to zero thinking" (*id.* at 6).  For example, Plaintiff
testified that she still spends time with a good friend, does
gardening, goes shopping, regularly goes to church, and her daily
activities include cleaning and doing activities with her children
(R. 65-66);  Plaintiff's husband indicated that Plaintiff does
housework with diffulty, does gardening, talks with a good friend,
and she drove and shopped as needed.  (R. 198-200.)  There is no
doubt that Plaintiff's impairments have an effect on her daily life

25

(*id.* at 7), but she has not shown that the limitation is marked and has not shown that the ALJ's determination on this issue is not supported by substantial evidence.

Similarly, Plaintiff's averment that she "has met the requirements" regarding social functioning relies on her testimony and the Function Reports in the record (Doc. 11 at 7) which the ALJ considered but did not find dispositive (R. 43).  In determining that Plaintiff had moderate difficulties in the area of social functioning, ALJ Cutter explained that

> [a]lthough the claimant alleged that memory loss and anxiety attacks precluded her ability to work and interact with others, the claimant interacted appropriately with all sources of record.  The claimant submitted into evidence a termination letter from a prior employer for inappropriate behavior, however there is no documentation of any incident when memory loss interfered with the claimant's ability to function or interact with others (Exhibit 5E).  Dr. Fretz observed that the claimant was cooperative with the examining consultant and manifested no evidence of a thought disorder or sever dysfunction in any area (Id.).  Although alleged difficulty with others and being argumentative, the doctor found that the claimant engaged in social settings and attended church services with a friend (Id.). The claimant testified to visiting family on weekends.  Therefore, the undersigned finds that although the claimant's [sic] do not rise to the level of marked as she does demonstrate the ability to interact appropriately, the claimant demonstrates moderate limitations.

(R. 43.)

While Plaintiff's testimony and averments as well as

information provided by her husband indicate that her anxiety and panic attacks at times make it difficult to get along with others (Doc. 11 at 7), isolated incidents of more extreme behavior like putting a blanket over her desk (*id.* (citing R. 204)), do not establish the presence of marked difficulties in this area of functioning.  Importantly, Plaintiff's characterization of some limitations are not supported by the record cited.  For example, Plaintiff states that she "becomes extremely annoyed and agitated if there are authority figures present."  (Doc. 11 at 7 (citing R. 210).)  However, the cited record shows that, in answer to the question of how well she got along with authority figures, Plaintiff said "apparently not very well.  I keep getting disciplined & fired.  I think they are wrong and I'm right."  (R. 210.)  This response indicates a disconnect between the averment made in Plaintiff's brief and the record evidence relied upon to support it.  Moreover, Plaintiff has not provided evidence which directly refutes that ALJ's detailed analysis.  Therefore, the Court concludes she has not shown that his conclusion is not based on substantial evidence.

Finally, Plaintiff's allegations concerning her inability to concentrate suffer from a similar failure, conflating documented memory and concentration "difficulties" with a marked impairment in this category.  (*See* Doc. 11 at 8.)  Regarding concentration, persistence or pace, ALJ Cutter concluded that Plaintiff had

moderate difficulties and referenced his discussion of social

functioning problems, reiterating his finding that

> there is no documentation of any incident
> when memory loss interfered with the
> claimant's ability to function.  Dr. Fretz
> noted that the claimant was somewhat slow
> with serial sevens and had some difficulty
> with attention and concentration, the
> claimant was able to understand and complete
> simple instructions and demonstrated no
> problems with adaptation (Exhibit 2A).

(R. 43-44.)

In support of her claimed error, Plaintiff does not directly

refute ALJ Cutter's analysis but, in addition to relying on her

subjective testimony, she provides numerous citations to the record

in support of the statements that she "has severe complications

with her memory and concentrating," and "doctors have stated that

Claimant's memory loss is progressively getting worse, which

affects her ability to concentrate."  (Doc. 11 at 8 (citing R. 33,

278, 281, 284, 288, 289, 291, 296, 299, 302, 303, 306, 322-33).)

Several citations are outside the relevant time period which began

on February 13, 2013, and ended on December 31, 2014.  (R. 6.)  A

review of the cited pages indicates that most precede the relevant

time period and thus reflect Plaintiff's condition while she was

working.  (R. 278, 281, 284, 288, 289, 291, 302, 303, 306.)

Another citation relates to a September 2015 office visit.  (R.

33.)  In general, records  verify that Plaintiff informed her

medical providers of her memory concerns, use of an insulin pump

was deemed inappropriate due to memory lapses or loss, and Plaintiff was assessed to have memory lapse or loss. (*See, e.g.*, R. 296.)  Plaintiff had a neurology consultation in October 2012 because of her reported memory loss, poor concentration, and fatigue.  (R. 332.)  However, Plaintiff does not appear to have followed up on the recommended testing and she did not return to the neurologist until September 2015.  (R. 33.)  Thus, records from the relevant time period do not support Plaintiff's statements: *objective* evidence does not show "severe complications with her memory and concentrating" and doctors have recorded Plaintiff's reports of worsening memory but the record does not support the statement that doctors have *objectively* stated this.  (*See* Doc. 11 at 8.)

Because Plaintiff has not shown that ALJ Cutter's determination regarding paragraph B requirements is not supported by substantial evidence, she has not shown error at step three. Therefore, the claimed step three error is not cause for reversal or remand.

## B. Residual Functional Capacity

With her second claimed error, Plaintiff asserts that the determination that Plaintiff could perform light work is error and should be reversed.  (Doc. 11 at 12.)   Defendant responds that the assertion is without merit.  (Doc. 14 at 19.)  The Court concludes that Plaintiff has not shown that the claimed error is cause for

reversal or remand.

Whether a claimant is disabled is a decision reserved to the Acting Commissioner.  20 C.F.R. § 404.1527(d)(1).  An ALJ is not required to include all claimed limitations in the RFC assessment, it is only "credibly established" limitations that must be included.  *Rutherford*, 399 F.3d at 554.

> Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible-the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993); [20 C.F.R. § 416.]929(c)(4)). . . . [L]imitations that are asserted by the claimant but lack objective medical support may possibly be considered nonetheless credible.  In that respect the ALJ can reject such limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it. ([20 C.F.R. § 416.](c)(3)).

399 F.3d at 554.

Here Plaintiff relies primarily on her subjective complaints (Doc. 11 at 12-13) which the ALJ did not find entirely credible (R. 45).  The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v.*

30

*Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility
determinations are the province of the ALJ and should only be
disturbed on review if not supported by substantial evidence."
*Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D.
Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873
(3d Cir. 1983)).

Plaintiff's discussion of this issue suffers from shortcomings
similar to those discussed above--conclusory statements accompanied
by citation to the record do not satisfy her burden of showing the
ALJ's determination is not supported by substantial evidence.  (*See*
Doc. 11 at 12-14.)  The ALJ concluded that the severity of
Plaintiff's subjectively expressed limitations and those of her
husband as well as some aspects of the examining source statement
are not supported by the longitudinal evidence of record.  (R. 45-
47.)  ALJ Cutter stated

> [i]n terms of the claimant's alleged
> disabling symptoms, the objective clinical
> findings do not corroborate the allegation to
> the disabling extent asserted.  Treatment
> notes show that although the claimant
> received sparse treatment for the allegedly
> disabling impairments, the treatment was
> routine and conservative in nature. . . .
> The claimant's main complaint of disabling
> symptoms was that of memory loss, which the
> undersigned finds not persuasive.  There was
> no diagnosis of an etiology for cognitive
> deficits, such as organic disease or
> dementia.  Although the claimant sometimes
> presents as anxious, medical records reveal
> the claimant as alert, oriented, with normal
> affect and expression, normal memory, normal
> attention span, normal speech and volume, no

31

> aphasia, and good insight with good fund of
> knowledge (Exhibits 1F, 2F, 7F).  The
> claimant alleged worsening attention,
> concentration and easily distracted or
> overwhelmed to a neurologist, but
> acknowledged that she could still function at
> home with no significant difficulties
> (Exhibit 7F, page 3).  The neurologist's
> examination of the claimant was basically
> within normal limits (Id. at 5).

(R. 45.)  The ALJ reviewed pharmacy records concerning medications
prescribed for anxiety, depression, and ADHD, finding that the
records reveal noncompliance in the form of delay refilling
prescriptions and usage patterns inconsistent with the severity of
reported symptoms.  (R. 45-46.)  ALJ Cutter's RFC analysis also
included a review of Plaintiff's activities of daily living which
he found "were not limited to the extent one would expect, given
the complaints of disabling symptoms and limitations."  (R. 46.)
Plaintiff's hearing presentation factored into the analysis--ALJ
Cutter observing that Plaintiff did not appear to have memory loss
during the hearing, she remembered sufficiently to recall
information necessary to answer questions and, although on a couple
of occasions she would state "'now what was that question,'" she
always remembered the answer to every question.  (R. 46.)

     As with her previous claimed error, Plaintiff does not
directly address the ALJ's support for his RFC but, as noted above,
she primarily sets out citations which she contends are supportive
of her inability to perform light work.  (Doc. 11 at 13.)  She
points to the VE's testimony that there would not be any jobs

Plaintiff could perform if she could only remain on task eighty percent of workday because of memory complications, but Plaintiff does not show that such a limitation was credibly established. Therefore she has not shown that it was error not to include it in the RFC. *Rutherford*, 399 F.3d at 554.

Because Plaintiff has not shown that the ALJ's RFC assessment is not supported by substantial evidence, she has not shown that the claimed RFC error is cause for reversal or remand.[3]

### V. Conclusion

For the reasons discussed above, Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied. An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: March 21, 2017

---

[3]   In the Conclusion section of her supporting brief, Plaintiff points to errors not identified as such in the body of her brief and not discussed in the Argument section of her brief. For example, Plaintiff takes issue with ALJ Cutter's consideration of Dr. Fischetto's findings, her testimony, and her husband's Third Party Function Report, stating that the ALJ "did not give any weight" to this evidence. (R. 14.) Although the Court need not address such conclusory assertions, it is noteworthy that Plaintiff's assertions are not accurate--ALJ Cutter did not find Plaintiff *entirely* credible, he found her husband's statements entitled to *little* weight, and he found Dr. Fischetto's opinion entiteld to *limited* weight. (R. 45-47.) Importantly, he included limitations related to her mental health impairments in his RFC. (R. 44-47.) Similarly, Plaintiff's allegation that ALJ Cutter did not appropriately assess her credibility is not consistent with a review of the ALJ's explanation of his RFC assessment. (*Id.*)